# SUPREME COURT OF THE UNITED STATES

TERENCE TRAMAINE ANDRUS *v.* TEXAS

ON PETITION FOR WRIT OF CERTIORARI TO THE COURT OF
CRIMINAL APPEALS OF TEXAS

No. 21–6001.   Decided June 13, 2022

The petition for a writ of certiorari is denied.

JUSTICE SOTOMAYOR, with whom JUSTICE BREYER and JUSTICE KAGAN join, dissenting from the denial of certiorari.

A state habeas court recommended vacating petitioner Terence Andrus' death sentence after an 8-day hearing that uncovered a plethora of mitigating evidence that trial counsel had failed to investigate or present. The court held that Andrus had received ineffective assistance of counsel at the punishment phase of his trial. See *Strickland* v. *Washington*, 466 U. S. 668 (1984). The Court of Criminal Appeals of Texas reversed; this Court summarily vacated and remanded. See *Andrus* v. *Texas*, 590 U. S. \_\_\_ (2020) (*per curiam*).

This Court held that counsel had rendered constitutionally deficient performance. That conclusion was based on an "apparent 'tidal wave'" of "compelling" and "powerful mitigating evidence" in the habeas record, none of which counsel presented to the jury. *Id.*, at \_\_\_, \_\_\_, \_\_\_ (slip op., at 9, 11, 18). The Court also found counsel ineffective for several specific failures to investigate and rebut the State's case in aggravation. *Id.*, at \_\_\_–\_\_\_ (slip op., at 13–16). The Court remanded to allow the Texas court to evaluate in the first instance whether, in light of the Court's holding as to deficient performance, Andrus had shown prejudice under *Strickland*.

On remand, the Court of Criminal Appeals, in a divided 5-to-4 decision, failed to follow this Court's ruling. Instead

of properly weighing the habeas evidence as a whole, the
Texas court concluded that Andrus failed to establish prej-
udice (and therefore denied habeas relief) based on its dis-
agreement with, and rejection of, the determinations un-
derlying this Court's holding that Andrus' counsel had
rendered deficient performance. As a result, the dissenting
judges below explained, the Texas court's opinion was irrec-
oncilable with this Court's prior decision and barred by ver-
tical *stare decisis* and the law of the case.

I agree with the dissenting judges below. Andrus' case
cries out for intervention, and it is particularly vital that
this Court act when necessary to protect against defiance of
its precedents. The Court, however, denies certiorari. I
would summarily reverse, and I respectfully dissent from
the Court's failure to do so.

I

A

This Court's prior decision outlined the events of Andrus'
trial and habeas proceedings. See *Andrus*, 590 U. S., at
___–___ (slip op., at 2–7). Only a brief summary follows.

In 2008, at age 20, Andrus killed Avelino Diaz and a by-
stander, Kim-Phuong Vu Bui, during an unsuccessful car-
jacking while under the influence of PCP-laced marijuana.
The State charged Andrus with capital murder. At the guilt
phase of trial, Andrus' counsel did not put on a defense case
and informed the jury, in closing, that "the punishment
phase" was "where we are going to be fighting." 45 Tr. 18.

But defense counsel hardly put up a fight at the punish-
ment phase. Counsel made no opening statement and al-
lowed the State to put on its case in aggravation essentially
without challenge. After the State rested, the jury heard a
mere shadow of a case in mitigation. See *Andrus*, 590 U. S.,
at ___–___ (slip op., at 3–4). Andrus' counsel presented only
a handful of witnesses, none of whom testified to the ex-
treme neglect, privations, and trauma of Andrus' youth or

his mental-health struggles as an adult. One of the witnesses, Andrus' mother, directly contradicted Andrus' own testimony as to his childhood, testimony that was thoroughly corroborated in subsequent habeas proceedings. Counsel thus enabled the State to argue credibly in closing that there was no piece of evidence before the jury "that reduce[d]" Andrus' "moral blameworthiness." 52 Tr. 49. "[N]ot one." *Ibid.* On this incomplete and corrupted presentation, the jury sentenced Andrus to death.

After the state appellate courts affirmed Andrus' conviction and sentence, he filed a state habeas application, now represented by competent counsel. Andrus alleged in the main that trial counsel had been ineffective for failing to investigate or present available evidence at the penalty phase. Over the course of an 8-day evidentiary hearing, Andrus presented a "tidal wave of information . . . with regard to mitigation" that the jury never heard. 7 Habeas Tr. 101. Based on this abundance of new evidence, see *Andrus*, 590 U. S., at \_\_\_–\_\_\_ (slip op., at 5–7), the state habeas court granted relief and ordered a new punishment trial.

The Court of Criminal Appeals of Texas reversed. In a unanimous order, it concluded that Andrus had "fail[ed] to meet his burden under *Strickland.*" App. to Pet. for Cert. 29. The court "decline[d] to adopt any of the trial court's findings of fact and conclusion of law" and denied relief based on "[its] own review of the record." *Ibid.*

B

Andrus petitioned for this Court's review. The Court granted certiorari, summarily vacated the decision below, and remanded for further proceedings. See *Andrus*, 590 U. S., at \_\_\_. The Court held, after a review of the record from the trial and habeas proceedings, that Andrus had met his burden of establishing constitutionally deficient performance by counsel under the first prong of *Strickland*.

This Court identified three categories in which counsel's

performance had fallen short. First, the Court held counsel ineffective for "perform[ing] almost no mitigation investigation, overlooking vast tranches of mitigating evidence" (including evidence of Andrus' disturbing childhood, the trauma he experienced in juvenile detention, and his life-long mental-health struggles) that would have been "compelling" and "powerful." *Andrus*, 590 U. S., at ___, ___ (slip op., at 9, 11). Second, the Court reasoned, counsel's mystifying introduction of "seemingly *aggravating* evidence," such as testimony from Andrus' mother that downplayed the horrors of his childhood and contradicted Andrus' own testimony, confirmed the "gaping distance" between his performance at trial and the constitutional minimum. *Id.*, at ___ (slip op., at 12). Third, the Court concluded that counsel had failed to investigate the State's case in aggravation and thus did not rebut critical aggravating evidence. *Id.*, at ___ (slip op., at 13).

Having found deficient performance, the Court remanded for a determination of prejudice under the second prong of *Strickland*. "[P]rejudice exists," the Court explained, "if there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether Andrus deserved the death penalty as opposed to a lesser sentence." *Andrus*, 590 U. S., at ___ (slip op., at 16). The Court cautioned that the Court of Criminal Appeals "must consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Ibid.* (quoting *Williams* v. *Taylor*, 529 U. S. 362, 397–398 (2000); alteration in original). Because Texas law requires a unanimous jury recommendation to impose death, "prejudice here requires only 'a reasonable probability that at least one juror would have struck a different balance' regarding Andrus' 'moral culpability.'" *Andrus*, 590 U. S., at ___ (slip op., at 17) (quoting *Wiggins* v. *Smith*, 539 U. S. 510, 537–538 (2003);

citing Tex. Code Crim. Proc. Ann., Art. 37.071, §2(e)(1) (Vernon 2006)).

### C

On remand, the Texas Court of Criminal Appeals denied relief, this time by a divided vote of five to four. *Ex parte Andrus*, 622 S. W. 3d 892 (2021).

In summarizing this Court's opinion vacating and remanding, the majority of the Texas court four times described this Court's conclusions as what the Court "believed." *Id.,* at 896–897. Twice more, the majority caveated this Court's determinations with "[a]ccording to the Court." *Ibid.* Most strikingly, the majority described what it called "certain *alleged* failures by counsel" from this Court's opinion, which had directly held that these failures constituted deficient performance under *Strickland* prong one. 622 S. W. 3d, at 897 (emphasis added); see *Andrus*, 590 U. S., at \_\_\_–\_\_\_ (slip op., at 8–16).

The majority proceeded to find no prejudice under *Strickland* prong two "because the mitigating evidence offered at the habeas stage was relatively weak . . . and because the aggravating evidence was strong." 622 S. W. 3d, at 899–900. The majority based its decision almost entirely on its disagreement with the conclusions underlying this Court's holding as to *Strickland* prong one. See, *e.g.*, 622 S. W. 3d, at 901 ("Although the Supreme Court described Applicant's infractions [while in juvenile detention] as 'notably mild,' we conclude that a jury would have been convinced otherwise"); *id.*, at 902 ("The Supreme Court discounted [Andrus' prior] crimes, but we do not"); *id.*, at 903–904 ("[T]he Supreme Court . . . criticized" a photo array, but "we do not judge [it] to be unduly suggestive"). It accordingly dismissed the mitigating evidence this Court had found "compelling" and "powerful," *Andrus*, 590 U. S., at \_\_\_, \_\_\_ (slip op., at 9, 11), as "not particularly compelling" and "relatively weak," 622 S. W. 3d, at 893, 900, 906.

Judge Newell dissented, joined by three of his colleagues. All four had joined their court's prior decision denying relief and expressed the belief that this Court's decision to vacate and remand was mistaken. *Id.*, at 908. Even so, the dissent opined, this Court's "characterization of the mitigation evidence that [Andrus'] trial attorney failed to uncover was integral to the determination that [Andrus'] attorney's representation fell below prevailing professional norms." *Id.*, at 909. In the dissent's view, the majority was not free to depart from this Court's conclusions. *Ibid.*

The dissent also criticized the majority for misapplying the applicable prejudice standard. All Andrus had to show was "a reasonable probability that at least one juror would have struck a different balance . . . and voted to spare [Andrus'] life." *Ibid.* "Based upon the Supreme Court's characterization of the mitigation evidence in this case, [Andrus] has met that standard." *Ibid.*

Andrus now asks this Court to summarily reverse, Pet. for Cert. 40, supported by eight *amicus curiae* briefs. The Court, however, denies certiorari.

## II

This Court previously held that Andrus received constitutionally deficient assistance of counsel. Andrus contends that he has shown that those deficiencies prejudiced him. See *Strickland*, 466 U. S., at 694. As noted, prejudice exists if there is a reasonable probability that, but for counsel's errors, a single juror "'would have struck a different balance' regarding Andrus' 'moral culpability.'" *Andrus*, 590 U. S., at ___ (slip op., at 17) (quoting *Wiggins*, 539 U. S., at 537–538). A court must evaluate "the totality of the available mitigation evidence . . . in reweighing it against the evidence in aggravation." *Williams*, 529 U. S., at 397–398.

Instead of weighing the totality of the evidence in a manner consistent with this Court's decision, the Court of Criminal Appeals violated vertical *stare decisis* and the law-of-

the-case doctrine by rejecting or ignoring the conclusions of this Court. It did not acknowledge powerful record evidence that contradicted its reasoning, and when it did grapple with the evidence this Court previously analyzed, it followed the views of the dissent from the Court's decision and not the holdings of this Court. As a result, it "either did not consider or unreasonably discounted" the evidence adduced in the habeas proceeding. *Porter* v. *McCollum*, 558 U. S. 30, 42 (2009) (*per curiam*). Applying the proper standard, Andrus is plainly entitled to relief, and the Texas court's contrary determination should be summarily reversed.

## A

The Court of Criminal Appeals unmistakably erred in its analysis of prejudice as to both unpresented mitigating evidence and unexplored evidence rebutting the State's case in aggravation.

## 1

Throughout its opinion, the Texas court rejected or ignored this Court's conclusions as to the childhood mitigation and mental-health mitigation evidence adduced on habeas review. To the minimal extent that the Texas court's analysis of the mitigating evidence relied on any evidence this Court did not consider, that reliance does not withstand the slightest scrutiny. The following analysis highlights only a small fraction of the volumes of mitigating evidence in the habeas record.

*Mitigating evidence—childhood.* This Court previously held that Andrus' counsel performed deficiently in large part because counsel failed to "look into or present the myriad tragic circumstances that marked [his] life." *Andrus*, 590 U. S., at \_\_\_ (slip op., at 10). As the Court outlined, "[t]he [habeas] evidence revealed a childhood marked by extreme neglect and privation." *Id.*, at \_\_\_ (slip op., at 5). That evidence included affidavits, testimony, or both from

two of Andrus' siblings, numerous other family friends and relatives, and two expert psychologists who investigated or evaluated Andrus' family circumstances, as well as many volumes of family medical and criminal records.

The habeas evidence showed that Andrus and his siblings were raised by a mother who engaged in prostitution, sold drugs, and habitually used drugs in front of the children. *Ibid.* She exposed the children to physical and sexual abuse through her violent boyfriends, one of whom raped Andrus' younger half-sister when she was a child. *Ibid.*; see also *id.*, at ___ (slip op., at 10) ("Andrus suffered 'very pronounced trauma' and posttraumatic stress disorder symptoms from, among other things, 'severe neglect' and exposure to domestic violence, substance abuse, and death in his childhood"). Beyond the evidence this Court specifically cited, expert habeas testimony established that "[w]itnessing domestic violence" was "traumatic" for Andrus, and that even if Andrus was not sexually abused himself, the consequences of the rape of his younger half-sister (notably, her removal from the family home) were emotionally disruptive for him, too. 6 Habeas Tr. 169, 218. There was also evidence that Andrus himself suffered physical abuse: His mother would beat him and his siblings with a board "until she got tired" and would enlist boyfriends to "hold the children down while she beat them" or beat them directly. 7 *id.*, at 127. Moreover, because Andrus' mother was so often absent or disoriented, she left her children to fend for themselves for extended periods, often without leaving them enough food to eat. *Andrus*, 590 U. S., at ___ (slip op., at 5). Lacking a stable parental figure, Andrus assumed responsibility for his four siblings at around 12 years old: He would cook breakfast for them, get them ready for school, clean for them, help them with their homework, make them dinner, and put them to bed. *Id.*, at ___–___ (slip op., at 5–6).

The jury heard virtually none of this evidence; counsel presented only scattered snippets of testimony that Andrus

was a good sibling and that his father was incarcerated for much of his childhood.  Thus, the Court explained, counsel "overlook[ed] vast tranches" of "compelling" and "powerful" mitigating evidence.  *Id.*, at ___, ___ (slip op., at 9, 11).[1]

This Court additionally held that counsel rendered deficient performance because he not only failed to put forward the mitigating evidence referred to above but also unwittingly aided the State's case in aggravation.  The Court noted that counsel elicited testimony from Andrus' mother that "did not reveal any difficult circumstances in Andrus' childhood" but falsely "sketched a portrait of a tranquil upbringing, during which Andrus got himself into trouble despite his family's best efforts."  *Id.*, at ___, ___ (slip op., at 3, 12).  This portrait directly "undermined Andrus' own testimony."  *Id.*, at ___ (slip op., at 13).  In fact, when Andrus testified that his mother sold drugs from their home, his counsel pointed out that she had said nothing to that end in her testimony.  As this Court previously observed, "[w]hether counsel merely intended to provide Andrus an opportunity to explain the discrepancy (or, far worse, sought to signal that his client was being deceitful) the jury could have understood counsel's statements to insinuate that Andrus was lying," a suggestion counsel "did nothing to dislodge."  *Ibid.*

On remand, the Court of Criminal Appeals found that Andrus failed to establish prejudice in part because the evidence of his horrific childhood "overlapped [with] evidence heard by the jury," save for some that was "not particularly compelling" and "relatively weak."  622 S. W. 3d, at 893, 900.  In particular, the Texas court expressed doubt as to

---

[1] Expert evidence on habeas review explained that Andrus' adverse childhood experiences caused "significant limitations in his childhood and adolescent development" that likely "formed the foundation for [his] negative life trajectory," including his "substance abuse, maladaptive behaviors, and ultimate resort to criminal violence."  13 Habeas Tr., Def. Exh. 5, p. 2; accord, 6 *id.*, at 152, 167–168.

whether Andrus had suffered physical or sexual abuse, re-
lying in part on a 2005 report stating that he denied physi-
cal abuse while in juvenile detention with the Texas Youth
Commission (TYC). *Id.*, at 900. That directly ignored this
Court's conclusion as to the devastating effects, and corre-
sponding mitigating value, of *exposure* to such abuse. In
addition, by relying on the 2005 TYC report to discount the
possibility that Andrus suffered physical abuse, the court
not only overlooked the habeas evidence of the details of his
beatings but also neglected to address expert testimony es-
tablishing that it was "common" and "expected" for juvenile
detainees to "deny having problems" in their homes so as to
avoid displaying weakness. 7 Habeas Tr. 32.[2]

As to the purported overlap, the Court of Criminal Ap-
peals stressed that some "evidence about family dysfunc-
tion" was presented to the jury. 622 S. W. 3d, at 900. It
observed that Andrus' mother testified that Andrus was
helpful in raising the children, Andrus' father testified that
he had been largely absent, and Andrus testified about his
mother's drug dealing and periodic abandonment, indicat-
ing that the evidence uncovered in state habeas proceedings
was redundant of that evidence. *Ibid.* But the court did not

---

[2] The Court of Criminal Appeals also minimized the mitigating impact
of Andrus' traumatic childhood because, while habeas evidence indicated
that he was left hungry, he reportedly once told a "Dr. Brown" that he
never went without food and did not testify to hunger at trial. 622 S. W.
3d, at 900–901. Here and elsewhere, the Texas court relied on represen-
tations in a letter from "Dr. Brown," a psychologist contacted at the last
minute by deficient trial counsel and who received "limited life history
documents." 13 Habeas Tr., Def. Exh. 2, p. 1. A testifying expert on ha-
beas review (who not only met with Andrus repeatedly but also reviewed
volumes of records and thoroughly investigated his background, and
whose testimony the state habeas court found credible) undercut Dr.
Brown's letter as poorly reasoned and unsubstantiated. See 6 *id.,* at 127–
128, 130; 7 *id.,* at 63–68, 150–151; 1 Supp. Clerk's Record 15. The Texas
court made no mention of this credible expert testimony, and more
broadly, it overlooked (as to the issue of hunger) that both Dr. Brown's
letter and Andrus' trial testimony were shaped by ineffective counsel.

address the yawning gap between this broadly "tranquil" portrait of Andrus' upbringing at trial and the "disturbing" reality revealed in excruciating detail on habeas review. *Andrus*, 590 U. S., at \_\_\_, \_\_\_ (slip op., at 10, 12). Nor did it consider how Andrus' counsel's presentation and comments undercut Andrus' testimony and aided the State. See *supra,* at 9.

*Mitigating evidence—mental health.* This Court also found deficient performance in counsel's failure to investigate or present evidence of Andrus' mental health. See *id.*, at \_\_\_–\_\_\_ (slip op., at 10–11). The Court noted that even "[w]hile attempting to care for his siblings," Andrus "struggled with mental-health issues." *Id.*, at \_\_\_ (slip op., at 6). Expert habeas evidence established that "the trauma of being in charge of [his] siblings and not having a parent there" contributed to Andrus' mental-health issues, deprived him of the ability to "trust anybody," and meant that he did not have his "own emotional needs met." 6 Habeas Tr. 168, 183.

This Court further observed how these issues worsened when a teenage Andrus spent 18 months in juvenile detention where he was "dosed on high quantities of psychotropic drugs" and "frequently relegated to extended stints of solitary confinement," leaving "an already traumatized Andrus all but suicidal." *Andrus*, 590 U. S., at \_\_\_ (slip op., at 1). The Court described Andrus' forcible medication as part of a traumatizing "ordeal," *ibid.*, again backed by compelling evidence from the habeas proceeding.[3] In addition, the

––––––––––

[3] Habeas evidence established that TYC officials improperly prescribed Andrus medications that could cause mania, aggression, and psychosis, among other adverse effects, and shifted him on and off these medications frequently. See 6 Habeas Tr. 160–165; 13 *id.*, Def. Exh. 1, at 3, 5; *id.*, Def. Exh. 4, at 6–7. Even as officials diagnosed Andrus with mental illnesses and subjected him to this rotating set of clinically inappropriate medications, they never provided him with the interventions he needed. See *id.*, at 8–9. Instead, they subjected him to a punitive "resocialization program" that was later discontinued and discredited, see *id.*, at 5–6, 9, and when he did not succeed, transferred him to adult prison, see, *e.g.*, 5

Court set forth the harm Andrus' solitary confinement in TYC custody imposed, levied "for purported infractions like reporting that he had heard voices telling him to do bad things." *Id.*, at ___ (slip op., at 6); see also *id.*, at ___, n. 2 (slip op., at 14, n. 2) (citing habeas evidence that Andrus was isolated "for 90 days at a time when [he] was 16 or 17 years old," which "'would horrify most current professionals'").[4] Andrus also engaged in self-harm and threats of suicide in TYC custody, this Court noted, acts that culminated a few years later when, detained pending trial for his capital offense, he slashed his wrist and smeared bloody messages on the walls asking to "'[j]ust let [him] die.'" *Id.*, at ___–___ (slip op., at 6–7).

In reasoning that Andrus had not established prejudice, the Court of Criminal Appeals stated that the evidence of mental-health issues "deserve[d] some skepticism." 622 S. W. 3d, at 901. It discounted Andrus' mental-health challenges because they "were not so severe or persistent as to keep him from . . . taking care of his siblings," *ibid.*, without accounting for record evidence of how Andrus' care for his siblings was consistent with, and exacerbated, those challenges. It criticized Andrus for "on the one hand . . . now claim[ing] he had mental health issues, but on the other . . . decr[ying] having been treated for them" with psychotropic medications while in TYC custody, *ibid.*, contravening this Court's conclusion as to the damage Andrus suffered from being forced to take clinically inappropriate medications.

––––––––––

*id.*, at 121–122 (TYC ombudsman: Andrus "was [unfairly] held accountable for failing in a failed system").

[4] The TYC ombudsman, appointed after mounting complaints and public scandals, condemned the agency's use of isolation and explained that it involved being locked in a small, dark, and windowless cell with a mattress. 5 *id.*, at 112, 122, 154–155; 13 *id.*, Def. Exh. 4, at 2–4. According to the ombudsman's expert testimony, TYC records showed Andrus was "decomposing" and "becoming unhinged" as a result of his repeated and prolonged isolation "in a dark, damp room with no communication, [no] school." 5 *id.*, at 170.

Moreover, the Texas court did not grapple with the harm Andrus suffered from his solitary confinement or his suicide attempt, both of which this Court highlighted as salient.[5]

Finally, the Texas court reasoned in its prejudice analysis that Andrus' mental-health issues were "also aggravating" because "Dr. Brown's report revealed . . . a disturbing history of animal cruelty" and "also revealed that [Andrus] enjoyed playing with fire and once set fire to his mother's apartment, though she was able to put out the fire." *Ibid.* The court again did not acknowledge Andrus' expert testimony (deemed credible by the state habeas court) attacking the reliability of these claims, which were made in a letter from a nontestifying psychologist contacted at the last minute by ineffective trial counsel. See n. 2, *supra.* But even if the court had been right to view Andrus' mental health as a double-edged sword, that would not be dispositive. The issue is whether the available mitigating evidence, whether susceptible to multiple interpretations or not, "might have sufficiently influenced the jury's appraisal of Andrus' moral culpability." *Andrus*, 590 U. S., at ___ (slip op., at 18) (internal quotation marks and alteration omitted). For that to be true, the evidence need not have made Andrus "any more likable to the jury," so long as it "helped the jury understand [him], and his horrendous acts." *Sears* v. *Upton*, 561 U. S.

───────────

[5] To the extent the Texas court cited any evidence in its mental-health mitigation discussion that this Court did not expressly mention, it gave significant weight to two written observations by individual TYC analysts regarding Andrus' mental health, pulled from about 1,000 pages of TYC records. See 622 S. W. 3d, at 901. But a testifying expert on habeas review, found credible by the state habeas court, testified that the TYC analysts' views were inconsistent, unreliable, and potentially pretextual, see 7 Habeas Tr. 78–80, 85; 1 Supp. Clerk's Record 15, and still other expert testimony (again, found credible) showed that TYC's mental-health program at the time lacked adequate oversight, staffing, and quality assurance, see 5 Habeas Tr. 161–162; 13 *id.,* Def. Exh. 4, at 6; 1 Supp. Clerk's Record 13. The Texas court did not so much as mention this contrary evidence.

945, 951 (2010) (*per curiam*).

The Court of Criminal Appeals improperly failed to consider or analyze any of Andrus' mitigating evidence beyond its rejection of this Court's conclusions. See *Williams*, 529 U. S., at 397–398 (finding State Supreme Court decision not just erroneous but unreasonable "insofar as it failed to evaluate the totality of the available mitigation evidence").

2

*Aggravating evidence.* The Court of Criminal Appeals was even more explicit in rejecting this Court's conclusions regarding counsel's failure to rebut the State's aggravating evidence.

At the penalty phase, the State bore the burden of proving that Andrus presented a future danger to society. See Tex. Code Crim. Proc. Ann., Art. 37.071, §2(b)(1). To that end, it put forth evidence that Andrus had been hostile and violent in TYC custody; that he had committed an uncharged aggravated robbery of a dry-cleaning business; that he had been involved in an aggravated robbery as a teenager, for which he was sent to TYC detention; that he had also been adjudicated as a juvenile for possession of a controlled substance and later pleaded guilty to misdemeanor theft; that he had gang-related tattoos; and that he had attacked prison officials while awaiting trial.

This Court held counsel deficient for failing to pursue "ample opportunit[ies]" to "rebut critical aggravating evidence." *Andrus*, 590 U. S., at ___ (slip op., at 13). First, this Court noted that although the State relied heavily on Andrus' acts of aggression while detained in TYC custody, investigation would have shown "that [his] behavioral problems [in TYC custody] were notably mild, and the harms he sustained severe." *Id.*, at ___ (slip op., at 14). The Court cited evidence from a TYC ombudsman who testified that it was "'surpris[ing] how few' citations Andrus received, 'particularly in the dorms where [Andrus] was' housed," and

that there was "'nothing uncommon' about Andrus' altercations because 'sometimes you . . . have to fight to get by' in the 'violent atmosphere' and 'savage environment.'" *Id.*, at ___, n. 2 (slip op., at 14, n. 2). Indeed, habeas evidence established that the "vast majority" of Andrus' citations at TYC were for "disruption of program," which could include "talking out of turn." 5 Habeas Tr. 174; 13 *id.*, Def. Exh. 4, p. 7.[6] Meanwhile, although Andrus was removed from the general population 77 times, approximately half of those were not punishments but "self-referrals" that he initiated to seek refuge from the "violent 'Lord of the Flies' scenario" and "brutal pecking order" within TYC, despite the unique horrors attended to isolation. 5 *id.*, at 155–156, 179, 183, 189, 204–205. As noted, TYC officials also punished Andrus with isolation for reporting that he was hearing voices. *Id.*, at 183; *Andrus*, 590 U. S., at ___ (slip op., at 6).

In view of this evidence, this Court explained: "[W]ith sufficient understanding of the violent environments Andrus inhabited his entire life, counsel could have provided a counternarrative of Andrus' later episodes in prison." *Id.*, at ___ (slip op., at 14). "[I]nstead, counsel left all of that aggravating evidence untouched at trial—even going so far as to inform the jury that the evidence made it 'probabl[e]'

_____

[6] For example, Andrus was cited for "throwing a paperclip," "shooting a rubber band," "talking while standing in line or . . . in the lunch room," and "eating a cookie in class." 5 Habeas Tr. 174; see also *id.*, at 187 ("I saw once he asked for a calculator. . . . Violated dress code, usually that means your shirt is not tucked in. He was talking during quiet time. Talked once after the lights were out"). TYC staff also issued citations simply to prove their work ethic to supervisors, or even for "self-referrals" to isolation. *Id.*, at 176–177. Given all of this, the TYC ombudsman explained, after reviewing about 1,000 pages of TYC records, that Andrus' number of citations was in fact "average or pretty low." *Id.*, at 177. Yet the jury heard none of this context. Instead, jurors heard largely unchallenged testimony (which the State emphasized in closing) suggesting that Andrus had received age-appropriate care and rejected a resocialization program, see 48 Tr. 60–61, 68–69, 73–74; 52 *id.*, at 31, a program that was later discontinued and discredited, see n. 3, *supra*.

that Andrus was 'a violent kind of guy.'" *Ibid.*

Although this Court "described [Andrus'] infractions at TYC as 'notably mild,'" the Court of Criminal Appeals believed "a jury would have been convinced otherwise." 622 S. W. 3d, at 901. The Texas court relied heavily on Andrus' 295 citations, including threats and assaults, and the 77 times he was "remove[d] . . . from the general population" (*i.e.*, placed in solitary confinement) before his transfer to adult prison. *Ibid.* In the court's view, this proved Andrus "was far more dangerous and disruptive than the typical juvenile held in custody of TYC," evidence that categorically "outweighed" the conditions at TYC. *Id.*, at 902.

The Court of Criminal Appeals doubly erred here. First, its assessment was irreconcilable with any reasonable analysis of Andrus' TYC record or with this Court's careful recitation of the record evidence. The Texas court relied on a mere sliver of the evidence: the overall numbers of times Andrus was cited or isolated (numbers that, as this Court previously explained, the record shows to be inflated) and the violent nature of some of his infractions. This Court considered that evidence and more, and it reached a directly contrary conclusion based on expert testimony (found credible by the state habeas court) that placed those infractions in context. See *Andrus*, 590 U. S., at ___, ___–___, and n. 2 (slip op., at 6, 13–14, and n. 2).

Second, this Court's precedents teach that even if "it is possible that a jury could have heard [all of the mitigating evidence] and still have decided on the death penalty, that is not the test." *Rompilla* v. *Beard*, 545 U. S. 374, 393 (2005). The likelihood of a different result "must be substantial, not just conceivable," *Harrington* v. *Richter*, 562 U. S. 86, 112 (2011), but "[w]e do not require a defendant to show that counsel's deficient conduct more likely than not altered the outcome of his penalty proceeding," *Porter*, 558 U. S., at 44 (internal quotation marks omitted). Moreover,

here, the likelihood of a different result need only be established as to one juror, not a unanimous jury. *Andrus*, 590 U. S., at ___ (slip op., at 17). Given the sheer volume of evidence supporting this Court's view of Andrus' TYC record, it is difficult to conclude that every reasonable juror would have rejected it. By reasoning otherwise, the court below appeared to hold Andrus to an improper standard.

Beyond Andrus' TYC record, this Court found counsel had been deficient by failing to rebut the State's reliance on Andrus' alleged commission of a knifepoint robbery at a dry-cleaning business. The Court noted that the State never charged Andrus for this robbery and that "the only evidence originally tying Andrus to the incident was a lone witness statement, later recanted by the witness, that led to the inclusion of Andrus' photograph in a belated photo array, which the police admitted gave rise to numerous reliability concerns." *Andrus*, 590 U. S., at ___–___ (slip op., at 14–15) (footnote omitted). "The very problem" was that the jury heard the State's account, "but not any of the significant evidence that would have cast doubt on Andrus' involvement in the offense at all." *Id.*, at ___ (slip op., at 15).

The Court of Criminal Appeals, on remand, found that Andrus had not been prejudiced by this failure because although "[t]he Supreme Court discounted" the State's prior-crimes evidence, it "d[id] not." 622 S. W. 3d, at 902. On the uncharged dry-cleaning robbery, the Texas court disapproved of this Court's "question[ing of] the reliability of the [pretrial, photo-array] identification," which it "d[id] not judge . . . to be unduly suggestive." *Id.*, at 903–904. The Texas court also second-guessed this Court's reliance on the witness' recantation and habeas testimony. *Id.*, at 904. Here again, the court squarely rejected this Court's analysis of the evidence on the performance prong to deny relief on the prejudice prong.[7] Moreover, the court overlooked

_____

[7] The court disagreed with this Court's characterization of a detective's

what this Court deemed "[t]he very problem" with counsel's failures: that the jury never heard any of the bases on which the statement and photo identification (made months after the incident by a victim who initially could tell the police only that he had been assaulted by "a black man," see 3 Habeas Tr. 65) were vulnerable to attack. Again, the issue is not whether habeas evidence conclusively establishes Andrus' innocence of the uncharged robbery, but whether it would be reasonably probable to lead one juror to strike a different balance.

The Court of Criminal Appeals also disputed this Court's analysis of the aggravated robbery for which Andrus was sentenced to TYC. The Texas court charged this Court with "discount[ing] this crime" because this Court said Andrus "'allegedly' act[ed] as a 'lookout.'" 622 S. W. 3d, at 902. Citing its opinion on direct appeal (from before the habeas hearing), the Texas court opined that the victim had identified Andrus as the gunman by his clothing. *Ibid.* The Texas court noted this Court's contrary determination, but concluded that "[t]he trial evidence solidly pointed to [Andrus] as the gunman." *Id.*, at 902–903. It thus reached another result that contradicted a conclusion of this Court. See *Andrus*, 590 U. S., at ___, n. 1 (slip op., at 6, n. 1). To

——————

testimony regarding the reliability of the pretrial photo-array identification, but the detective in fact conceded the relevant point. See 8 Habeas Tr. 35 ("Q: . . . Only one of [the men in the array] is looking directly up and out. Do you see that? And that's Terence Andrus? A: Yes. [Number] 3 may be looking out, but I understand your point"). In any event, this Court clearly considered and rejected the Texas court's precise argument. Compare 622 S. W. 3d, at 903, with 590 U. S., at ___, and n. 4 (slip op., at 15, and n. 4); *id.,* at ___, n. 4 (ALITO, J., dissenting) (slip op., at 6, n. 4). Similarly, for the witness' recantation and habeas testimony, this Court already considered and rejected all of the court below's arguments save one (the witness' relationship with Andrus) in its exchange with the dissent. Compare 622 S. W. 3d, at 904, with *Andrus*, 590 U. S., at ___, n. 4 (slip op., at 15, n. 4); *id.*, at ___, and nn. 3, 4 (ALITO, J., dissenting) (slip op., at 6, and nn. 3, 4).

be sure, as the Texas court noted, this Court erroneously said that "*the victim* described at least two individuals as wearing such clothing," *ibid.* (emphasis added), when it should have said that *a responding sergeant* described at least two individuals as wearing such clothing, see 46 Tr. 25–27. The point stands, however: The victim could not identify faces or individuals, only clothing, and Andrus was not the only individual wearing the clothing identified by the victim. More broadly, the Texas court once again seemed to apply a heightened prejudice standard by dismissing the possibility that even one juror might agree with this Court's assessment of the evidence. See *Wiggins*, 539 U. S., at 537–538 (prejudice requires only "a reasonable probability that at least one juror would have struck a different balance" of a capital defendant's "moral culpability").

### 3

*Conclusion.* Aside from the Court of Criminal Appeals' description of the undisputed brutality of Andrus' capital crime and its accounting of his violence while incarcerated pending trial, see 622 S. W. 3d, at 902, 904–905, its analysis of prejudice impermissibly contravened the reasoning on which this Court relied to find deficient performance. The Court of Criminal Appeals also declined to account for substantial record evidence that undercut its conclusions and misapplied the relevant legal standards.

Even the State, in its brief opposing certiorari, does not meaningfully attempt to reconcile the Court of Criminal Appeals' reasoning with this Court's prior decision. Instead, the State echoes the Texas court's critiques of that precedent, repeatedly attacking it rather than accepting its premises as settled. On remand from this Court, however, other courts generally are not free to dispute this Court's conclusions. To the contrary, "it is essential" that courts "follow both the words and the music of Supreme Court

opinions" on issues of federal law. *United States* v. *Martinez-Cruz*, 736 F. 3d 999, 1006 (CADC 2013) (Kavanaugh, J., dissenting). The Court of Criminal Appeals followed neither here.

## B

"[E]xtricating" the court's "improper . . . analysis from [its] opinion leaves too little that might warrant reaching a different conclusion than did the trial court." *Moore* v. *Texas*, 586 U. S. ___, ___ (2019) (*per curiam*) (slip op., at 10). It is impossible reasonably to disagree with the state habeas court and the dissenting judges below: There exists a reasonable probability that, had counsel presented the evidence uncovered on habeas review, at least one juror would have struck a different balance.

At sentencing, the jury heard next to nothing "that would humanize [Andrus] or allow [the jury] to accurately gauge his moral culpability." *Porter*, 558 U. S., at 41. Andrus' mother offered only a sparse chronology of his childhood and painted a counterproductive portrait of that period of his life as relatively tranquil. Andrus' biological father, who also testified at sentencing, hardly knew Andrus (having been absent or incarcerated for almost all of his childhood) and could venture only that Andrus seemed "good around [him]" the one year they lived together. 50 Tr. 8. Counsel's direct examination of Andrus about his childhood was cursory (constituting about four pages of the trial transcript) and followed the contrary testimony of his mother. The only potentially mitigating evidence, then, was (1) a lone expert's generalized opinion that drugs can hamper the adolescent brain's ability to make sound judgments, and (2) lay testimony that Andrus' "antisocial personality disorder" led him to be "manipulative" and that Andrus had begun to vocalize remorse in the prior two months. 51 *id.*, at 34, 37. But the former point hardly needs proof (as the State pointed out, see *Andrus*, 590 U. S., at ___ (slip op., at 4)),

and the latter testimony told a double-edged and incomplete story at best. All told, the jury heard hardly a whisper of the appalling circumstances that marred Andrus' childhood and adolescence, enabling the State to assert while cross-examining Andrus that the jury never "heard one mitigating circumstance in [his] life." 51 Tr. 60.

Meanwhile, "there exists too much mitigating evidence that was not presented to now be ignored." *Porter*, 558 U. S., at 44 (internal quotation marks omitted). The jury never heard the extensive reports that, throughout Andrus' childhood, Andrus' mother was often too drugged to pay attention to her children, had a string of abusive and drug-addicted boyfriends, and frequently left her five children to fend for themselves while she went out and took drugs for extended periods. The jury never heard the details regarding the physical abuse young Andrus reportedly suffered, the domestic violence he witnessed, or the sexual abuse that tore a beloved younger sibling from his home. The jury never heard the poignant accounts by Andrus' siblings of how Andrus had cared and provided for them when their parents would not. The jury never heard expert testimony that the severe neglect and privation Andrus suffered as a child left him damaged and emotionally stunted.[8] The jury never heard about the harrowing experiences Andrus endured in the TYC system, the damaging effects of his prolonged periods of isolation there, and the utter lack of appropriate support he received. The jury never heard about the line Andrus' experts later drew between all of this hardship and trauma and the trajectory of his life. The jury

———————

[8] This Court has repeatedly recognized the potency of childhood neglect and exposure to violence as mitigating evidence in capital punishment proceedings, even where it does not directly rebut the prosecution's arguments for death. See, *e.g.*, *Porter*, 558 U. S., at 33, 43; *Rompilla* v. *Beard*, 545 U. S. 374, 392 (2005); *Wiggins* v. *Smith*, 539 U. S. 510, 525 (2003); *Williams* v. *Taylor*, 529 U. S. 362, 395 (2000).

never heard about Andrus' diagnosis with affective psychosis or his various other mitigating mental-health issues. These scores of lengthy reports went well beyond anything in Andrus' brief trial testimony, which was uncorroborated at trial and undermined by his own mother. All of this "accumulated [evidence] would have destroyed the benign conception of [Andrus'] upbringing and mental capacity defense counsel had formed." *Rompilla*, 545 U. S., at 391.

The State's unrebutted aggravating evidence, to be sure, was forceful. The evidence of Andrus' violent behavior and defiance while detained, however, could have been understood in a much different light had counsel investigated and presented the significant body of mitigating evidence revealed at the habeas hearing. As noted, there was "nothing uncommon" about the citations Andrus received for violent behavior while in TYC custody; given the "savage" environment, the TYC ombudsman was "surprised how few" incidents were noted in Andrus' record. 5 Habeas Tr. 189. Andrus' exceptionally turbulent introduction to the state detention system, a punishment for his inability to succeed in a failed and discredited program when he was 16, also may have influenced how the jury evaluated his later incidents of violence in prison. Especially considering the severe neglect Andrus experienced as a child, the jury could have viewed his aggressive behavior as borne out of deep-seated distrust of others. See *Sears*, 561 U. S., at 951.

Beyond that, untapped evidence could have blunted the force of the State's other aggravating circumstances. As the habeas evidence revealed, counsel could have introduced significant doubt regarding the State's linking of Andrus to the uncharged dry-cleaning robbery. As for the State's suggestion that Andrus lacked remorse because he appeared to express it only shortly before trial, evidence of his mental-health struggles, culminating in his suicide attempt while incarcerated pending trial, could have persuaded the jury that he was battling inner turmoil far beyond what he was

able to vocalize.[9]

In sum, effective counsel would have painted a vividly different tableau of aggravating and mitigating evidence than was presented at trial. During the punishment phase, the State's aggravating evidence went largely unchallenged, while the defense's mitigating evidence consisted of a few biographical facts about Andrus and some damaging information that tended to portray Andrus as morally culpable. In contrast, if measured against "the totality of the available mitigation evidence," *Williams*, 529 U. S., at 397, the State's aggravating evidence would have appeared dramatically different, while the defense's case in mitigation would have gone from counterproductive to compelling. Given that sea change, I find it clear that the "tidal wave," 7 Habeas Tr. 101, of "available mitigating evidence, taken as a whole, 'might well have influenced the jury's appraisal' of [Andrus'] moral culpability," *Wiggins*, 539 U. S., at 538 (quoting *Williams*, 529 U. S., at 398). Because there is a reasonable probability that "at least one juror would have struck a different balance," *Wiggins*, 539 U. S., at 537, I would summarily reverse.

## III

I dissent with full recognition that summary reversal is "a rare disposition, usually reserved by this Court for situations in which the law is settled and stable, the facts are

_____

[9] After trial, once Andrus was in a safe environment and was no longer being prescribed clinically "inappropriate" medications, habeas evidence indicated that he had "virtually no record of misconduct" in prison. 7 Habeas Tr. 51. Andrus now produces visual art and poetry, see https://www.terenceandrus.com, and published an essay reflecting on this Court's prior decision in his case, see T. Andrus, Reflection on *Andrus v. Texas*, 134 Harv. L. Rev. Forum 78 (2020). Although the sentencing jury would not have known of these facts, they are not inconsequential: They underscore the force of Andrus' mental-health mitigation evidence and demonstrate his potential for moral redemption, a potential that the jury was never given an opportunity to see.

not in dispute, and the decision below is clearly in error." *Schweiker* v. *Hansen*, 450 U. S. 785, 791 (1981) (Marshall, J., dissenting). Rightly so. This Court must exercise its certiorari jurisdiction and apply its resources in a manner that entrusts the lower courts with the diligent and proper resolution of individual cases.

Even so, summary dispositions remain appropriate in truly extraordinary cases involving categories of errors that strike at the heart of our legal system. Cf., *e.g., City and County of San Francisco* v. *Sheehan*, 575 U. S. 600, 611, n. 3 (2015) (explaining that error correction is warranted where an issue has particular "importance . . . 'to society as a whole'"). This is certainly true in capital cases like this one, where the life-or-death stakes engender a special "need for reliability in the determination that death is the appropriate punishment in a specific case." *Woodson* v. *North Carolina*, 428 U. S. 280, 305 (1976) (plurality opinion).

Summary correction is particularly necessary where, as here, a lower court clearly and directly contravenes this Court's settled precedent. See, *e.g., Bosse* v. *Oklahoma*, 580 U. S. 1 (2016) (*per curiam*). That is all the more so when this Court remands and the subsequent lower court opinion, "when taken as a whole and when read in the light both of our prior opinion and the . . . record, rests upon analysis too much of which too closely resembles what we previously found improper." *Moore*, 586 U. S., at ___ (slip op., at 10). Such defiance of vertical *stare decisis*, if allowed to stand, substantially erodes confidence in the functioning of the legal system.

That is precisely what this Court permits today. As I have explained, and as the dissenting judges below warned, the Court of Criminal Appeals' opinion on remand cannot be reconciled with this Court's prior opinion, let alone with the habeas record. In fact, the Texas court repeatedly indicated its disdain for this Court's conclusions. At bottom,

were the Texas court's characterizations of the record correct, this Court hardly could have found deficient performance. These errors are especially damaging because they bear on the right to effective assistance of counsel, the very "foundation for our adversary system," *Martinez* v. *Ryan*, 566 U. S. 1, 12 (2012), in a capital case where the stakes could not be higher. If summary reversal is ever warranted, it is warranted here.

This Court's failure to act does not mark the end of the road for Andrus. He still may seek federal habeas review of the Court of Criminal Appeals' ultimate denial of relief, a denial that plainly "was contrary to, or involved an unreasonable application of, clearly established" precedents of this Court. 28 U. S. C. §2254(d)(1). The Court's refusal today to exercise its discretionary certiorari jurisdiction must not be misinterpreted to foreclose such relief. Nevertheless, the Court's refusal is lamentable. In view of the egregious nature of the errors below, the overwhelming record evidence, the unparalleled stakes for Andrus, and the importance of protecting and enforcing vertical *stare decisis*, I would not leave such errors unresolved, and I respectfully dissent.